# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KENDALE SIMS,

                    Plaintiff,

v.                                                        Case No. 15-CV-1249-JPS

DR. KESHENA, FOSTER, and
CAPTAIN KUSTER,

                    Defendants.                           **ORDER**

Plaintiff Kendale Sims ("Sims"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendants, alleging that they were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Defendants are three individuals who worked at Oshkosh Correctional Institution ("Oshkosh"), the prison where Sims was housed during the events alleged in his complaint. Sims claims that Defendant Dr. Kate Keshena ("Dr. Keshena") prescribed antidepressant medication for him despite knowing that it would cause severe side effects. For Defendant Danielle Foster ("Foster"), the Health Services Unit ("HSU") manager at the prison, Sims alleges that she ignored his health services request forms in which he complained of worsening side effects from the medication. Lastly, Sims alleges that Defendant Captain Hans Kuster ("Kuster") failed to properly respond after Sims complained to him about the adverse side effects of his medication.

Defendants filed a motion for summary judgment on October 3, 2016. (Docket #86). On November 8, 2016, the Court granted Plaintiff's request for an extension of time to review Defendants' discovery responses and to draft a response to Defendants' motion. (Docket #104). Because Plaintiff had

already filed a response to the motion, the Court directed Plaintiff to file an amended response that incorporated whatever new evidence and argument he sought to make based on Defendants' discovery responses. *Id.* On November 16, 2016, Plaintiff filed his amended response, which was largely identical to his initial response but incorporated a handful of new exhibits and arguments. *See* (Docket #107 and #113). Defendants replied to the amended response on November 22, 2016. (Docket #117). Defendants' motion is fully briefed and, for the reasons explained below, it will be granted.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence

demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3.      RELEVANT FACTS**

Sims has been incarcerated at Waupun Correctional Institution since June 12, 2015. (Docket #118, ¶ 1).[1] From February 10, 2015 to June 12, 2015, and all times relevant to this action, Sims was incarcerated at Oshkosh. *Id.* Prior to Oshkosh, Sims was an inmate at Green Bay Correctional Institution ("Green Bay"). *Id.*

At all times relevant, Dr. Keshena was employed by the Wisconsin Department of Corrections ("DOC") as a psychiatrist at Oshkosh. *Id.* ¶ 3. Kuster was employed by DOC as a Supervisor II (Captain) at Oshkosh. *Id.* ¶ 4. Foster was employed by DOC as a Nursing Supervisor and manager of the HSU at Oshkosh. *Id.* ¶ 5.

Shortly after arriving at Oshkosh, Sims was in a fight with another inmate and was given a disciplinary ticket for 120 days in segregation. *Id.* ¶ 6. Sims was housed in Oshkosh's Restrictive Housing Unit from February 19, 2015 through June 12, 2015, the date he was transferred to Green Bay, due to his behavioral problems. *Id.* ¶ 7. The Restrictive Housing Unit is a unit which houses inmates who need more intensive supervision, as well as more closely restricted and monitored privileges based upon their record of serious behavioral issues while in prison. *Id.* ¶ 8. Restrictive housing was formerly

---

[1]Defendants filed a reply in support of their statement of material facts. (Docket #118). The Local Rules do not contemplate a reply in support of the moving party's own statement of facts, *see* Civ. L. R. 56(b)(3)(B), but Sims did not object to its filing and the document succinctly presents the parties' competing views of the record evidence. As a result, the Court will reference it here.

known as "segregation" and such placement may put the inmate at a greater risk for self-harm behavior. *Id.* ¶ 9.

### 3.1 Sims' Prescription of Venlafaxine

Prior to his transfer to Oshkosh, Sims was being treated by a psychiatrist at Green Bay and was prescribed venlafaxine, an antidepressant. *Id.* ¶ 10. Venlafaxine (also known under the brand name Effexor) is a commonly-prescribed antidepressant known to have very low rates of life-threatening or lethal outcomes when compared to other psychotropic medications. *Id.* ¶ 16. Venlafaxine has been known to cause headaches in some people, but this risk is low. *Id.* ¶ 17. Other very common side effects include nausea, insomnia, or dizziness. *Id.* Venlafaxine is a medication that should be tapered gradually prior to discontinuation. *Id.* ¶ 18. One risk of stopping venlafaxine abruptly is that a patient may develop discontinuation syndrome, with symptoms including dizziness, nausea, stomach cramps, sweating, and tingling. *Id.*[2]

On January 23, 2015, Dr. Gary Maier ("Dr. Maier"), a psychiatrist working at Green Bay, prescribed the venlafaxine because of Sims' diagnosis

---

[2]Dr. Keshena avers that venlafaxine has very low rates of life-threatening or lethal outcomes when compared to other psychotropic medications. *See* (Docket #118 ¶ 16). Sims disputes this, claiming that it is merely her opinion and that he "has factual proof that venlafaxine is harmful to people taking it." *Id.* Sims' proof, however, consists of his own statements that he suffered side effects from taking venlafaxine, two printouts from webpages describing possible side effects of the medication, and what appear to be posts on an internet forum about individuals and their experiences with venlafaxine. *See* (Docket #112 at 5–8, 69–71); *see also* (Docket #119 ¶¶ 26–27) (Sims claiming that venlafaxine has mild or no side effects at low dosages). This material is not competent evidence that can reasonably call into question Dr. Keshena's medical opinion. *See* Fed. R. Civ. P. 56(c) (requiring the non-movant to cite to particular parts of the record demonstrating a genuine dispute of fact or to explain why the cited material does not support the asserted fact).

Case 2:15-cv-01249-JPS   Filed 12/28/16   Page 4 of 26   Document 122

of unspecified mood disorder, with associated depression and adult ADHD by history. *Id.* ¶ 11. Venlafaxine was prescribed to replace another medication Sims had been taking for mood instability. *Id.* ¶ 12. Dr. Maier's note of January 23, 2015 indicates that venlafaxine can be effective for depression, anxiety and adult ADHD. *Id.* ¶ 13. He prescribed venlafaxine at a single daily dose of 75 mg. *Id.* ¶ 14. Dr. Maier obtained informed consent from Sims before prescribing the venlafaxine. *Id.* ¶ 15.

Sims was assigned to be one of Dr. Keshena's patients when he was transferred to Oshkosh in February 2015. *Id.* ¶ 19. She had two appointments with Sims while he was an inmate at Oshkosh. *Id.* ¶ 20. The first was on March 13, 2015. *Id.* ¶ 21. Sims was referred for the appointment because he had been treated by Dr. Maier at Green Bay and was on psychiatric medication when he was transferred to Oshkosh. *Id.* The appointment was to maintain continuity of care. *Id.* Sims had also filed a request for such an appointment in late February 2015. *Id.* ¶ 38.

At the March 13, 2015 appointment, Dr. Keshena discussed with Sims the use of and the potential benefits of venlafaxine, including what the medication would be able to help and what it would not help. *Id.* ¶ 22. Sims claims that "Dr. Keshena never told me about the risk of venlafaxine and how it would affect me as the dose went up. Had I known about these risks I would have had a chance of refusing the raise in the medication." *See id.* At this appointment, Sims reported feelings of anger, increased depression, and trouble sleeping. *Id.* ¶ 23. He also reported a history of self-harm and suicide attempts, and he believed his medication was not working. *Id.* He did not, however, report any physical symptoms to Dr. Keshena, and he admits that he was suffering none at the time. *Id.* Dr. Keshena advised Sims that

Case 2:15-cv-01249-JPS   Filed 12/28/16   Page 5 of 26   Document 122

venlafaxine would not likely help with his anger. *Id.* ¶ 24. She discussed the benefits of therapy sessions to address his anger issues. *Id.*

At this appointment, Dr. Keshena diagnosed Sims with depressive disorder, alcohol use disorder, rule out PTSD, and borderline personality disorder. *Id.* ¶ 25. She recommended increasing the daily dose of venlafaxine to better alleviate his depression, sadness, chronic suicidal ideation, and his difficulty with sleep. *Id.* ¶ 26. Dr. Keshena's notes reflect that Sims was "agreeable to increasing his current dose of venlafaxine." (Docket #89-1 at 24). Sims asserts that he "told Dr. Keshena about his problems with the venlafaxine, and told her he wanted to be taken off of it, but she stated she wanted him to give it another try before stopping it. She was very adamant about this, leaving Sims no other choice but to agree." (Docket #118 ¶ 27). Sims also asserts that he asked about decreasing his dosage, but Dr. Keshena told him that it would take a long time to wean him from the medication. *See id.* ¶ 30. He claims that despite his complaint that venlafaxine was not working for him, she encouraged him to give the higher dosage a try before they gave up on it. (Docket #119 ¶ 8).

Dr. Keshena ordered the daily dose of venlafaxine be increased from 75 mg to 112.5 mg on March 13, 2015. (Docket #118 ¶ 28). She avers that she made this treatment decision based on the following factors:

(1) Sims had a history of attempting suicide on multiple occasions and this put him at an elevated risk of future suicide attempts;

(2) Sims reportedly felt sad and was having chronic thoughts of suicide;

(3) the stressors that led to Sims's suicidal thoughts were long-term problems that are not quickly or easily remedied;

(4) Sims had multiple episodes of self-harm;

(5) Sims was in the segregation unit and demonstrated that he did not have the appropriate coping skills to conform his behavior to be able to maintain in a general population setting for longer than one week; and

(6) Sims was not experiencing side effects of the medicine and given the amount of time it would take to get him off the venlafaxine and restart another medication, it made more sense to increase the dose, as he was taking only one-third of the maximum dose.

*Id.* ¶ 31. Given all of the risk factors, Dr. Keshena determined, based upon her medical and psychiatric expertise, that the current dose of antidepressant medication was not adequately treating Sims' reported symptoms. *Id.* ¶ 32. Sims disagrees, stating that she "never explored any other options [except] increasing the dose" and "she didn't consider the side effects" of the drug. *Id.*

Dr. Keshena avers that she increased the dose of Sims's medication in an effort to relieve Sims' reported symptoms and requested that he be seen again in six to eight weeks. *Id.* ¶ 33. Because Sims had been able to tolerate the medication since January 2015, Dr. Keshena believed the potential benefits of the medication outweighed the risks of not adequately treating Sims's mental illness or the risk of potential side effects. *Id.* ¶ 34. At no time during the appointment on March 13, 2015 did Sims report symptoms of dizziness, headaches, nausea, or "brain shocks." *Id.* ¶ 35. If Sims had reported such symptoms, and Dr. Keshena believed the symptoms were related to the medication, Dr. Keshena would have tried to wean Sims off the venlafaxine. *Id.* ¶ 36.

### 3.2 Sims' Medical Visits and Complaints After March 30, 2015

When inmates enter Wisconsin DOC institutions, they are given an inmate handbook informing them that if they require nonemergency medical attention they must submit a Health Services Request ("HSR") or a Psychiatric Services Request ("PSR") to the HSU. Inmates are informed that if they need to see medical/psychiatric staff immediately for a medical emergency, they need to alert unit staff of their concern. *Id.* ¶ 37. Sims submitted twelve HSRs between February 25, 2012 and June 5, 2012. *Id.* ¶ 38. For four of those HSRs, dated February 25, March 29, April 19, and May 14, 2015, nurses from the HSU flagged the forms for review by Dr. Keshena since they concerned his medication and his request for an appointment with his psychiatrist. *Id.* Those four HSRs are briefly described as follows:

> (1) Sims submitted an HSR dated February 25, 2015 wherein he stated that he believed his medications were not working and he requested to see the psychiatrist. Dr. Keshena reviewed this HSR on March 6, 2015 and saw him on March 13, 2015, as described above.

> (2) Sims submitted an HSR dated March 29, 2015 and stated, "I would like to change my meds, I don't like what they do to me, and if you can come talk to me I would like to talk to you about a few things that's going on."

> (3) Sims submitted an HSR dated April 19, 2015 and reported that he would like to be taken off of his medication and that he "got sick" when he tried to take himself off of the medication.

> (4) Sims submitted an HSR dated May 14, 2015 wherein he stated that he believed he was suffering from "bad" medication side effects.

*Id.* On each of these four HSRs, Dr. Keshena wrote a response that she would discuss it with him at the next scheduled appointment. *Id.* Dr. Keshena made

this decision because it is her practice not to change a medication without meeting a patient face-to-face for an assessment due to the increased risk of suicide in patients with changes in antidepressant medication. *Id.* ¶ 39. Dr. Keshena avoids making changes to a patient's medication on the basis of a written HSR because she wants to assess the patient and understand the reason for the requested change in medication in a face-to-face meeting, especially in the case of a patient who has a history of suicide attempts and self-harm, and when the medication is an antidepressant. *Id.* ¶¶ 40–41.

Beyond these four HSRs which were presented to Dr. Keshena, Sims submitted numerous other HSRs and was seen by HSU staff on several occasions during this time period. *Id.* ¶ 53. The Court will discuss only those instances which are relevant here. First was a visit with a nurse on March 30, 2015, in response to his March 29, 2015 HSR. *Id.* ¶ 57. At this visit, Sims said that he did not like "the effects my meds give me." *Id.* ¶ 57. Sims reported at that time that the medication made him urinate frequently, made him shaky, and gave him diarrhea. *Id.* However, Sims also told the nurse, "I don't want to be taken off the meds though." *Id.* Sims reported he was taking all of his scheduled medications and had not been in trouble for a while. *Id.*

The nurse instructed Sims to continue with his scheduled medication as ordered and that she would flag the progress note for the psychiatrist's attention. *Id.* In response to Defendants' motion, Sims states that he did not want to be taken off the venlafaxine at this time because Dr. Keshena told him that the medication "wouldn't right away have a full impact for weeks until the medication started to get in his system." *Id.* He states that, as of March 30, 2015, he "felt he was in what Dr. Keshena called 'the honeymoon period' so he wanted to give it time to see if things passed." *Id.*; (Docket #119 ¶¶ 42–43). Sims further asserts that at his March 30 visit, the nurse put him

Case 2:15-cv-01249-JPS   Filed 12/28/16   Page 9 of 26   Document 122

on the "short list" to see Dr. Keshena. (Docket #119 ¶ 9). It appears from the medical records submitted that Dr. Keshena saw the nurse's notes from the March 30, 2015 visit and made no changes to the course of treatment or appointment schedule. (Docket #89-1 at 9).

After his appointment on March 30, 2015, Sims avers that his side effects from the venlafaxine took a turn for the worse. He claims that he experienced "self-harm thoughts, suicidal ideation, as well as physical side effects, such as dizziness, headaches, anxiety, nausea, diarrhea, vomiting, trouble sleeping, weight loss, and unusual behavior." (Docket #119 ¶ 10). Contrary to his belief that he was on the "short list" to see Dr. Keshena, he was not seen again by early April. *Id.* He submitted an HSR on April 1, 2015, inquiring when his next appointment would be and asking what he should "do about the meds now, because I don't like the side effects." (Docket #89-1 at 34). This HSR was not flagged for Dr. Keshena's review, and the nurse who reviewed the complaint instructed Sims to discuss with a nurse what side effects he was experiencing. *Id.*

Next, Sims had a visit with an HSU physician on April 10, 2015 regarding his complaints of weight loss. (Docket #118 ¶ 58). During this visit, Sims denied feeling dizzy, having headaches, having fainting episodes, or any of the other symptoms he now claims he was suffering at that time. *Id.* Sims avers that he tried to raise his ongoing concerns about venlafaxine with the doctor, who stated that he was not a psychiatrist and that Sims would have to make a separate request to see the psychiatrist about those issues. *Id.*

After another month elapsed without a follow-up visit with Dr. Keshena, Sims felt that he had to stop the medication on his own in order to end the side effects. (Docket #119 ¶ 11). When he unilaterally determined that he should stop taking the medication, "he experienced horrible withdraw[al]

symptoms." *Id.* He claims he experienced these symptoms for five days, from April 15 to April 20, 2015, and that the withdrawal symptoms included sensitivity to light and sound, "brain shocks," headaches, nerve pain, involuntary movements, and trouble concentrating. *Id.*

On April 20, 2015, he spoke with a prison crisis worker about his decision to stop taking venlafaxine. *Id.* ¶ 12. The worker advised him to start taking the medication again, which Sims agreed to do. *Id.* This meant that the withdrawal symptoms subsided, but the medication's side effects began again. *Id.* He claims that he "put people on notice" of his problems with venlafaxine, including Dr. Keshena, Kuster, and other correctional officers and staff, but he does not explain what this "notice" entailed and he does not state when such instances of notice occurred, nor are there any documented instances of such notice beyond those discussed herein. *Id.* ¶ 14.

Sims submitted yet another HSR on May 2, 2015, stating that he had been waiting too long for his next appointment with Dr. Keshena about getting off of venlafaxine. (Docket #89-1 at 37). Like the HSR dated April 1, 2015, this request was not presented to Dr. Keshena. *Id.* Instead, the nurse responded that Sims was "soon to see" Dr. Keshena and could discuss his concerns with her at that time. *Id.*

In his final appointment before seeing Dr. Keshena again, Sims was seen for dental pain on June 2, 2015. (Docket #118 ¶ 59). He did not report any other medical concerns at that time. *Id.* Sims was prescribed the antibiotic amoxicillin, common side effects of which are nausea, vomiting, and diarrhea. *Id.* Sims counters that he was experiencing those symptoms prior to being prescribed amoxicillin and that he could not have raised his concerns about venlafaxine at a dental visit, since the dentist would merely tell him to present those concerns to the psychiatrist. *Id.*

As part of his amended response to Defendants' motion for summary judgment, Sims emphasizes that Dr. Keshena worked on many days during this period and should have taken the time to see him. (Docket #120 ¶ 66). It is undisputed that Dr. Keshena worked on March 21, 22, and 27, April 6, 24, and 25, May 1, 16, 18, 19, 22, 24, and 27, and June 1 and 5, 2015. *Id.* Sims contends that "although [he] isn't Dr. Keshena's only patient," she "could [have] found some time to come see him" given the number of hours she spent working during that period. *Id.* ¶¶ 67, 69–70.

As the timeline above demonstrates, Dr. Keshena reviewed Sims's medical chart each time a nurse flagged it to her attention. (Docket #118 ¶ 42). At no time between Dr. Keshena's first appointment with Sims on March 13, 2015 and her follow-up appointment with him on June 7, 2015, was she made aware of the symptoms that Sims claims he suffered after March 30, 2015. *Id.* ¶ 43. Instead, in each of the HSRs that was flagged for Dr. Keshena, Sims made generalized complaints about his need for an appointment with her or a need to change his medication because of its side effects. *Id.* ¶ 44. At no time did Dr. Keshena believe that Sims was experiencing a medical or psychiatric emergency that required immediate attention. *Id.* ¶ 45.

### 3.3   Sims' Injury and Second Appointment with Dr. Keshena

On June 6, 2015, Sims felt dizzy, lost consciousness, and fell and hit his forehead on the toilet. *Id.* ¶ 60. He was found by a correctional officer on the floor of his cell. *Id.* The officer, who observed a large lump on Sims' head, called HSU, and Sims was seen later that day by an HSU nurse. *Id.* Sims reported to her that venlafaxine tended to make him dizzy about thirty

minutes after taking the medication. *Id.* He also reported to the nurse that he suffered from nausea, vomiting, and diarrhea. *Id.* ¶ 61.[3]

On June 7, 2015, Dr. Keshena had a second appointment with Sims. *Id.* ¶ 46. Sims reported to her that he did not like being on venlafaxine and that he had side effects that he described as "brain shocks" when he tried to stop the medication. *Id.* Sims also told her that he had tried to stop the medication but could not tolerate the withdrawal symptoms. *Id.* Sims also reported that he had become dizzy and blacked out in his cell, resulting in a visit with a nurse. *Id.* ¶ 47. Based on this report of symptoms, Dr. Keshena decided to discontinue his venlafaxine by tapering Sims' dosage over the next few months. *Id.* She also noted that the decision to take him off the medication was predicated in part on the danger presented by a patient who will not take a medication as prescribed. *Id.* She ordered that Sims's daily dose of venlafaxine be decreased to 75 mg for one month, then a further decrease to 37.5 mg daily for six months, then a follow-up with a psychiatrist in eight weeks. *Id.* ¶ 48. After June 7, 2015, Dr. Keshena had no further interaction with Sims as he was transferred to a different institution on June 12. *Id.* ¶ 50.

### 3.4    HSU Manager Foster

As noted above, Foster was the manager of the HSU at Oshkosh while Sims was an inmate there. *Id.* ¶ 66. As the HSU manager, Foster provided the overall administrative support and direction of the unit. *Id.* ¶ 67. By contrast,

---

[3]Defendants say that this was Sims' first report of feeling dizzy from the venlafaxine. (Docket #118 ¶ 54). Sims, however, states that he reported dizziness to Kuster and several other correctional officers who are not parties to this action. *Id.* Defendants likewise try to attribute Sims' symptoms to his recent prescription of amoxicillin, but they admit that he previously reported diarrhea at the HSU visit on March 30, 2015. *Id.* Defendants connect Sims' dizziness and his fainting to dehydration brought about by his nausea, vomiting, and diarrhea, but Sims asserts that he had been keeping himself hydrated during this period. *Id.* ¶ 62.

the primary care physicians, psychiatrists, and nurse practitioners are responsible for the professional management of medical and mental health services. *Id.* As manager of the HSU, Foster did not have authority to instruct physicians or psychiatrists about the direct delivery of medical care to patients. *Id.* ¶ 68. As a nurse, neither Foster, nor the nurses she supervised in HSU, are authorized to prescribe or modify prescription medications. *Id.* Foster also lacked the authority to determine when patients were seen by primary care physicians or by psychiatric staff. *Id.* ¶ 69.

The HSU at Oshkosh is responsible for managing the medical care for thousands of inmates. *Id.* ¶ 74. Oshkosh HSU receives an average of 80–100 HSRs every day and sees an average of 1400–1600 inmate patients on a weekly basis. *Id.* As a result, it is not practical that the HSU manager review all inmate HSRs. *Id.* Instead, the nurse clinicians triage the HSRs. *Id.* ¶ 71. Due to Foster's role as HSU manager, she typically does not review or even become aware of a particular patient request on an HSR forms unless the triage nurse clinicians determine there is an emergency or an issue of which she needs to be made aware. *Id.* If the triage nurse, based on his or her professional judgment, is able to address the patient request, Foster will not see that patient request. *Id.*

Foster was not informed about Sims's medical condition, his HSRs, or any medical complaints Sims may have had during his incarceration at Oshkosh until the date he was transferred out of Oshkosh. *Id.* ¶¶ 70, 72. Foster did not make comments or written responses to Sims's patient request forms during the time period of confinement at Oshkosh. *Id.* ¶ 73. Indeed, Foster did not receive any written or verbal communications from or about Sims before June 12, 2015, when she received an email inquiring about Sims's medical chart concerning his offender complaints. *Id.* ¶ 75.

### 3.5    Captain Hans Kuster

Kuster was the Restricted Housing Unit Captain while Sims was confined at Oshkosh. *Id.* ¶ 76. On May 11, 2015, during Kuster's rounds of the Restricted Housing Unit, Sims informed Kuster that his medication was making him sick, that he wanted to stop taking it, and that Sims wanted Kuster to contact his psychiatrist because Sims wanted an appointment. *Id.* ¶ 77. Sims contends he spoke with Kuster on this topic more than once, although he cannot recall the dates of any conversation other than that of May 11, 2015. *Id.* Pursuant to DOC policy, Kuster informed Sims to submit an HSR form to the HSU regarding his medication. *Id.* ¶ 79. Kuster also later contacted the HSU by telephone informing them of Sims's request to see his psychiatrist. *Id.* Kuster was informed that Sims was on the list to be seen by a psychiatrist. *Id.*

Kuster does not supervise the psychiatry staff and has no control over scheduling by the psychiatry staff or the HSU staff. *Id.* ¶ 80. DOC policy requires that if an inmate has an emergency situation, expresses thoughts of self-harm, or requests to go on clinical observation status, Kuster would contact the HSU or the psychologist on call immediately. *Id.* ¶ 82. Based on Kuster's experience and training, Sims did not have an emergency situation, nor did he indicate thoughts of self-harm or the need for clinical observation status. *Id.* Sims asserts that he told the prison crisis worker that he had thoughts of self-harm, as noted above, but Sims does not dispute that he never said this to Kuster. *Id.*

### 4.    ANALYSIS

Sims claims that each Defendant demonstrated deliberate indifference to his serious medical needs. Because each Defendant participated in his care

in different capacities, Sims' claim against each of the Defendants is legally distinct. The Court will discuss each Defendant in turn.

### 4.1 Dr. Kate Keshena—Treating Psychiatrist

Sims' complaint about Dr. Keshena is two-fold: first, during the March 13, 2015 appointment, Dr. Keshena should have reduced Sims' dosage of venlafaxine rather than increased it; second, Dr. Keshena should have more thoroughly investigated his HSRs regarding venlafaxine side effects and should have seen him earlier in light of those complaints. As explained below, the Court finds each of these theories unavailing.[4]

For an Eighth Amendment claim of deliberate indifference to a serious medical need, the plaintiff must prove: (1) an objectively serious medical condition; (2) that the defendant knew of the condition and was deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some

---

[4]To the extent Sims attempts to raise an informed-consent claim relating to Dr. Keshena's alleged failure to discuss with him the side effects of venlafaxine, *see* (Docket #111 at 9–10), this theory of liability is nowhere found in his complaint and cannot be raised for the first time in response to a motion for summary judgment. *See Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997); *Johnson v. Razdan*, 564 F. App'x 481, 484 (8th Cir. 2014); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Thus, the Court will not address this claim further.

Case 2:15-cv-01249-JPS   Filed 12/28/16   Page 16 of 26   Document 122

injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).[5] The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The question is not whether the plaintiff believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Instead, he must prove that the defendant's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their]

---

[5]Defendants contest whether Sims ever suffered from a serious medical condition at all, arguing that the side effects he complains about might have been caused by increased depression or his choice to stop taking venlafaxine. (Docket #87 at 11–12). Defendants' argument is, in reality, less about the first element—whether Sims had a serious medical condition—since it is clear that Sims suffered from serious psychiatric conditions. Instead, Defendants' argument is about causation—that is, whether Dr. Keshena's treatment of Sims' conditions, as opposed to other factors, caused Sims harm. Because the Court concludes that Dr. Keshena was not deliberately indifferent to Sims' medical needs, it need not reach the causation question. *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (observing that a court "could [skip] all medical questions, relying entirely on the lack of evidence of deliberate indifference" by the defendant).

conduct can be inferred." *Gayton*, 593 F.3d at 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)); *see also Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Mere dissatisfaction with a particular course of treatment, or even malpractice, does not amount to deliberate indifference."). Courts must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999).

In response to Defendants' motion, Sims offers only his own views as to what treatment he should have received. For instance, it is his opinion that Dr. Keshena should have, at Sims' request, reduced his dosage of venlafaxine at the March 13, 2015 appointment. Yet he points to no record evidence, beyond his own assessment of the circumstances, that Dr. Keshena's treatment decision was such a reckless departure from accepted medical standards as to show deliberate indifference to his medical needs. *Estate of Cole*, 94 F.3d at 261–62. Indeed, Sims provides no evidence of what the appropriate standard of care would be in this instance, much less how Dr. Keshena's conduct fell below that standard.

Sims cites the complaints of some unknown individuals on the internet about venlafaxine as well as the ubiquitous laundry list of possible side effects that normally accompanies such medications. *See supra* note 2. These items are not evidence that Dr. Keshena should have known that Sims would likely suffer these side effects, since at the time of the March 13, 2015 appointment, Sims admits he suffered from none of the side effects that would surface later that month. Nor does Sims' evidence suggest that Dr. Keshena did not appreciate the possible or probable side effects of venlafaxine when making her treatment decision. In fact, the opposite is true,

for Dr. Keshena considered the lack of side effects, in addition to a number of other relevant factors, in coming to the decision to increase Sims' dosage. Sims presents neither evidence nor argument rebutting these bases for her decision except to blithely state that she did not, in fact, consider the side effects of the medication. On this record, the Court cannot draw such an inference. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("[W]e are not required to draw every conceivable inference from the record. Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (internal quotation and citations omitted). Indeed, contrary to his position in this litigation, at the time of the appointment, Dr. Keshena convinced Sims, despite his misgivings about the medication, to give the higher dosage a try before undertaking the long and difficult process of weaning him off the drug.

Further, to the extent Sims suggests that Dr. Keshena made the easy decision to increase the medication rather than wean him off of it, *see* (Docket #118 ¶ 31), this alone does not support a deliberate indifference claim absent a showing that she knew that the allegedly less onerous treatment method would be ineffective. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Sims has provided no evidence coming close to that mark. Rather, the evidence shows that Dr. Keshena came to a considered treatment decision based on the relevant facts available to her at the time, thereby providing Sims with "adequate, reasonable medical treatment." *Id.* at 1014. As such, Sims has failed to proffer facts showing that Dr. Keshena's decision to increase his venlafaxine dosage on March 13, 2015 was the result of deliberate indifference to his medical needs.

Likewise, Sims' claim about Dr. Keshena's failure to investigate his HSRs and the delay in his second appointment is without any competent

evidence to support it. Sims argues that the numerous HSRs he submitted placed on Dr. Keshena the responsibility to inquire further about his condition and make time to see him right away. (Docket #111 at 6–7). However, the HSRs forwarded to Dr. Keshena by HSU staff reveal almost nothing about the problems Sims was suffering. He merely stated that he disliked his medication, the same complaint he made at the March 13, 2015 appointment and which Dr. Keshena convinced him to set aside. He also claimed that he was experiencing "bad" side effects, but he gave no details as to what those side effects were or how severe they had become.

Sims' generalized complaints did not put Dr. Keshena on notice that he had an obvious need for immediate treatment. *See Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996). Whatever Sims may have reported to the prison crisis worker, Kuster, or other correctional staff about his problems, the record shows that Dr. Keshena knew only that Sims disliked his medication and experienced some unwanted side effects. If Dr. Keshena had received reports of the plethora of symptoms Sims apparently suffered from late March 2015 onward, and if she had ignored such reports, the story might be different. *Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005) (finding viable claims of deliberate indifference where medical personnel knew of the inmate's worsening condition and persisted in ineffective treatments); *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2010) (unexplained ten-month delay in treatment could support deliberate indifference claim if the physician was aware of the severity of the inmate's condition). As it stands, however, Sims' vague HSRs failed to imbue Dr. Keshena with the level of knowledge required to support a deliberate indifference claim. *Farmer*, 511 U.S. at 837 (deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference"). Similarly, Sims makes much of the fact that his second appointment was four weeks later than the six to eight weeks Dr. Keshena originally stated on March 13, 2015, (Docket #118 ¶40), but without knowledge of the severe adverse side effects he was suffered, Dr. Keshena could not be found deliberately indifferent because of this delay. While the Court appreciates that Sims may have suffered painful side effects from his prescription, he cannot charge Dr. Keshena with deliberate indifference unless she knew about these problems. The record shows that as soon as she learned of Sims' problems in June 2015, she took action to abate them. That she did not act sooner was not a violation of Sims' constitutional rights.

Furthermore, even if Dr. Keshena was wrong in failing to undertake more rigorous investigation of Sims' complaints, Sims' claim is at worst that she was negligent. He falls short of showing that her failure to do more in response to his HSRs was "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). Dr. Keshena decided that despite Sims' complaints about wanting to stop the venlafaxine, she could not make an appropriate decision on that request until their next in-person meeting. She did not detect in his HSRs any medical emergency requiring acceleration of the schedule for that appointment. Accordingly, on the facts available to her, she determined that the matter could wait. Although Sims believes that Dr. Keshena avoided him until she had no other choice—that is, until he blacked out and injured his head, *see* (Docket #119 ¶ 61)—the record shows that Dr. Keshena made decisions under the circumstances which were not constitutionally inadequate. *Snipes*, 95 F.3d at 592 ("A prisoner's

dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'") (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)). Neither does the Court credit Sims' specious argument that simply because Dr. Keshena worked on certain days during the relevant period, she could have and should have made some time to see him on an expedited basis.

It appears that, at some level, Sims appreciates his untenable position, for he states that it would have been "more reasonable" for Dr. Keshena to see him sooner than she did. (Docket #118 ¶ 40). But the question in a deliberate indifference suit is not whether one course of treatment would be more reasonable than another, but instead whether the course taken was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole*, 94 F.3d at 261–62. Dr. Keshena's treatment decisions could not be described in this way by any reasonable jury. *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). Accordingly, summary judgment is appropriate on this claim.

### 4.2 Danielle Foster—HSU Manager

Sims claims that Foster was deliberately indifferent to his serious medical need because she knew of his frequent HSRs related to the side effects of venlafaxine and ignored them. In his response to Defendants' motion, however, Sims does not devote any separate argument to his claims against Foster, focusing almost exclusively on Dr. Keshena's alleged

misconduct. However, rather than find that he abandoned the claim, the Court will instead explain why Sims' claim against Foster must be dismissed on its merits.

Liability under Section 1983 is generally premised on personal fault. An individual cannot be held liable in a Section 1983 action unless she caused or participated in an alleged unconstitutional deprivation of rights. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise."). As stated above, to demonstrate that Foster was deliberately indifferent to his medical needs, Sims must proffer evidence that she knew of a substantial risk to his health and disregarded it. *See Gayton*, 593 F.3d at 620. To establish that she is liable in her supervisory capacity, Sims would have to meet an even higher bar, showing that she knew about the unconstitutional actions of her subordinates and facilitated them, approved them, condoned them, or turned a blind eye to them. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Sims disputed none of the facts proffered by Defendants with respect to Foster. As a result, it is undisputed here that Foster was not informed about Sims's medical condition, his HSRs, or any medical complaints Sims may have had during his incarceration at Oshkosh until the date he was transferred out of Oshkosh. Additionally, Foster did not have authority to modify prescriptions and could not determine when patients were to be seen by primary care physicians or by psychiatric staff. On these facts, the Court cannot attribute the requisite knowledge to Foster to hold that she was deliberately indifferent to Sims' medical needs. *Farmer*, 511 U.S. at 837 . Instead, the record reflects that Foster did not participate in Sims' care in any

Case 2:15-cv-01249-JPS   Filed 12/28/16   Page 23 of 26   Document 122

fashion, nor did she even know about his medical conditions or complaints during the relevant period. Moreover, even if Foster had known of Sims' medical needs, she lacked the power to do anything about them. Accordingly, Sims' claim against Foster must be dismissed.

### 4.3 Captain Hans Kuster—Correctional Officer

Sims' final claim, against Captain Kuster, is that Kuster failed to report Sims' medical complaints to the HSU staff. Yet, like his claim against Foster, Sims gives very little attention in his brief to his claim against Kuster. Nevertheless, as with Foster, the Court will proceed to the merits rather than find the claim against Kuster waived.

Non-medical prison officials are generally entitled to rely on the expertise of medical personnel. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Greeno*, 414 F.3d at 656 ("'If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'") (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). This is because "holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain [the] division of labor" within the prison. *Spruill*, 372 F.3d at 236. Accordingly, non-medical prison officials can be liable for deliberate indifference to an inmate's medical needs only where "they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (quoting *Spruill*, 372 F.3d at 236). This standard is quite high. If a non-medical prison official does not ignore the inmate but instead investigates the inmate's complaint and refers them to the appropriate medical staff, his duty is at an end. *Greeno*, 414 F.3d at 656; *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator,

[defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate].").

As with Foster, Sims contested none of the facts Defendants stated in their motion with respect to Kuster. This leaves the following facts undisputed: on one or more occasions during the relevant period, during Kuster's rounds of the Restricted Housing Unit, Sims informed Kuster that his medication was making him sick, that he wanted to stop taking it, and that Sims wanted Kuster to contact his psychiatrist because Sims wanted an appointment. Based on Kuster's experience and training, Sims did not present himself as having an emergency situation, nor did Sims indicate thoughts of self-harm or the need for clinical observation status. As a result, Kuster followed his normal practice of informing Sims to submit an HSR form to the HSU. Kuster also telephoned the HSU to inform them of Sims's request to see his psychiatrist, and he was told that Sims was on the list to be seen.

Nothing in the record suggests that Kuster was deliberately indifferent to Sims' medical needs. Rather, Kuster discharged his limited duty by speaking with Sims about his complaints rather than ignoring him. Further, because Sims was not in a medical emergency, Kuster was not remiss in instructing Sims to submit an HSR about his concerns with the venlafaxine. In fact, Kuster went so far as to call the HSU himself to ensure they knew of Sims' complaints. Moreover, Kuster had no reason to believe that Sims' treatment by Dr. Keshena or other medical staff was severely inadequate. Consequently, no reasonable jury could conclude that Kuster was deliberately indifferent to Sims' medical needs. Under these circumstances, Kuster reasonably relied on the expertise of the medical professionals. *See Greeno*, 414 F.3d at 656; *Spruill*, 372 F.3d at 236.

## 5.   CONCLUSION

Sims has presented no evidence requiring the resolution of factual disputes by a jury. Instead, on the undisputed facts and the entire record in this case, Sims' claims fail as a matter of law. Therefore, the Court will grant Defendants' motion for summary judgment and dismiss Sims' claims with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #86) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants Dr. Kate Keshena, Danielle Foster, and Captain Hans Kuster be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file an amended response to Defendants' motion for summary judgment (Docket #103) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Plaintiff's motions to deny Defendants' motion for summary judgment (Docket #95 and #107) be and the same are hereby **DENIED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of December, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge